# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

**PRESENT: HON. JOAN A. MADDEN** **PART 11**
*Justice*

In the Matter of Sine Time Holdings

**Plaintiff,**

\- v -

**Defendant.**

INDEX NO.: 101119/06

MOTION DATE: 4/20/06

MOTION SEQ. NO.: 001

MOTION CAL. NO.:

The following papers, numbered 1 to ____ were read on this ~~motion~~ petition to/~~for~~ stay arbitration:

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits | |
| Answering Affidavits — Exhibits | |
| Replying Affidavits | |

Cross-Motion: [ ] Yes [ ] No

**Upon the foregoing papers, it is ordered that this ~~motion~~** petition is decided in accordance with the annexed memorandum Decision, order + Judgment.

**Dated:** May 26, 2006

____________ **J.S.C.**

**Check one:** [X] **FINAL DISPOSITION** [ ] **NON-FINAL DISPOSITION**

SUPREME COURT STATE OF NEW YORK,
COUNTY OF NEW YORK: IAS PART 11

-----------------------------------------X Index No. 101119/06

In the Matter of the Application of Same Time Holdings Ltd. and Red Board Ltd, for a Judgment Staying Arbitration of Guarantee Agreement Commenced by International Sourcing and Marketing, Ltd.

-----------------------------------------X

Joan A. Madden, J.

Petitioners Same Time Holdings Ltd. ("Same Time") and Red Board Ltd. ("Red Board") (together "the Companies") move pursuant to CPLR 7503(b) to stay the arbitration commenced by respondent International Sourcing and Marketing, Ltd. ("ISM") to the extent the arbitration concerns claims based on the Companies alleged breach of a guarantee agreement. Respondent opposes the petition, which is denied for the reasons below.

Background

Same Time is a Bermuda corporation and the parent company of Red Board, a Hong Kong corporation whose business includes the manufacture of printed circuit boards in mainland China. ISM, a Rhode Island corporation, is an international sales and marketing company that served as the Companies' agent in certain geographical areas, including North America.

On or about June 1, 2002, the Companies and ISM executed a Sales Representative Agreement ("SRA") which contains the terms and conditions of the parties' business relationship in which ISM served as the Companies' representative for the sale of printed

circuit boards in various places in the world. The SRA includes an arbitration clause which provides that "[a]ll disputes arising in connection with this Agreement shall be finally settled under the Rules of the American Arbitration Association by a single arbitrator appointed in accordance with the said Rules and setting in New York, USA." It also states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of New York, USA."

On June 19, 2004, the parties entered into "the Amendment to the Sales Representative Agreement" ("the Amendment") and "the Guarantee Agreement." Neither the Amendment nor the Guarantee Agreement contains an arbitration provision. Both agreements provide that they are to be "governed and construed" under New York law.

The Amendment modifies certain terms and conditions of the SRA and provides that the "parties ratify and confirm the [SRA] as amended hereby and agree that, except as amended hereby, the [SRA] shall remain in full force and effect."

The Guarantee Agreement also contains a ratification provision stating that the parties "ratify and confirm [the SRA] as amended and agree that [the SRA] shall remain in full force and effect." In addition the Guarantee Agreement, provides that "all activities related to printed circuit boards engaged in by [the Companies]...are specifically subject to the terms of the

[SRA] and this Guarantee Agreement."

The Guarantee states that the parties entered in the SRA "for the purpose of, among other things, prescribing the terms and conditions whereby ISM would as a sales representative of [the Companies] ... and whereby [the Companies] would be responsible for the design, development and production of such products." The Guarantee Agreement further states that the Companies are responsible for providing a "stable production environment," and then indicates that the termination of certain management team members in China threatens the ability of the Companies to perform their responsibilities under the SRA.

The Guarantee Agreement also sets forth certain "trigger events" to measure whether the Companies are maintaining the kind of production environment needed to meet their obligations under the SRA, and imposes liquidated damages in the event of the occurrence of a trigger event. These trigger events include, inter alia, (a) the closing of the factory by any Chinese government or regulatory agency causes a failure to meet customer delivery requirements; (b) failure of Companies to obtain necessary permits or licenses causes a failure to meet customer delivery requirements; or (c) management instability causes the disqualification or reduction of orders by any ISM customer representing over 10% of total ISM sales, loss of suspension of key industry certification, or reduction of net factory

production below 2.4 million square feet for any calendar quarter.

On December 28, 2005, ISM served the Companies with a Notice of, and Demand for, Arbitration ("Arbitration Demand"), seeking arbitration before the International Centre for Dispute Resolution of the American Arbitration Association, as mandated under the SRA. Of relevance here, the Arbitration Demand contains certain claims related to the alleged breach of the Guarantee Agreement.

Specifically, it is alleged that the September 2004 closing of the Red Board factory, the incarceration of factory manager, the imposition of fines by the Chinese government, and Red Board's failure to renew the contracts of its management team and to make appropriate replacements, among other things, resulted in the "serious deterioration in the quality and quantity of produce output, unauthorized process changes, and unilateral extensions of time required to complete customer orders."

It is further alleged that these problems resulted in four distinct trigger events under the Guarantee Agreement, that notice of these trigger events was given to the Companies by letter dated November 11, 2005, and that under the Guarantee Agreement Red Board must pay ISM $7,180,000 for the total value of commissions earned during the twelve month period immediately preceding each trigger event. The Companies answered the

Arbitration Demand and asserted a counterclaim for breach of fiduciary duty.

The Companies now seek to stay the arbitration of the claims relating to the Guarantee Agreement, asserting that they never agreed to arbitrate such claims. The Companies point out that the Guarantee Agreement does not contain an arbitration provision and assert that they cannot be compelled to arbitrate based on the arbitration provision in the SRA.

In addition, the Companies assert that while the Amendment indicates parties' intent to have the SRA and the Amendment considered as one agreement, that the language of the Guarantee Agreement indicates no similar intent. In particular, the Companies point out that while the ratification provision contained in the Amendment states that the parties "ratify and confirm the [SRA] as amended hereby, and agree, except as amended hereby that the [SRA] shall remain in full force and effect" a similar provision in the Guarantee Agreement does not include the "amended hereby" phrase, thus indicating a lack of intent to incorporate the provisions of the SRA, including its arbitration clause.

ISM counters that the claims regarding the Guarantee Agreement fall within the broad arbitration provision of the SRA and are therefore arbitrable under the Federal Arbitration Act. Specifically, ISM contends that although the Guarantee Agreement

does not contain a separate arbitration clause, that the dispute relating to the Guarantee Agreement is subject to arbitration as it relates to the parties' rights and obligation under the SRA, and it is irrelevant whether or not the Guarantee Agreement is considered a collateral or side agreement.

In reply, the Companies assert that whether the claim is subject to arbitration is a question of contract interpretation which is governed by the principles of state contract law. The Companies also assert that under these principles, the Companies did not agree to arbitrate claims related to the Guarantee Agreement, and that to the extent that there is any ambiguity as to the contract terms, such ambiguity must be interpreted against ISM, which drafted the Guarantee Agreement.

Discussion

As the underlying dispute "'arises out of a contract evidencing interstate commerce,'" it is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"). Smith Barney, Harris Upham & Co, Inc. v Luckie, 85 NY2d 193, 200-201 (1995) quoting 9 U.S.C. § 2. The FAA "creates a body of federal substantive law of arbitrability applicable to any arbitration agreement within the coverage of the Act." PaineWebber, Inc. v. Bybyk, 81 F3d 1193, 1198 (2d Dept 1996)(citation omitted).

Moreover, the New York choice of law clauses in the relevant agreements indicate an intent that the substantive principles of

~~New York law govern the parties' relationship, rather than the~~ special rules regarding arbitration. See Mastrobuono v. Shearson Lehman Hutton, Inc., 514 US 52 (1995); Smith Barney Shearson Inc. v. Sacharow, 91 NY2d 39 (1997). Thus, to the extent that the issue regarding the scope of the parties' agreement to arbitrate requires the interpretation of the parties' agreements, principles of the applicable state law, in this case New York, apply. See First Options of Chicago v. Kaplan, 514 U.S. 938, 944 (1995).

Under New York law, the court must infer the parties' intention from all the provisions of the agreement. American Express Bank Ltd. v. Uniroyal, Inc., 164 AD2d 275, 277 (1st Dept 1990), appeal denied, 77 NY2d 807 (1991). Moreover, in interpreting the agreement, the document must be read as a whole to determine the parties' purpose and intent, giving a practical interpretation to the language employed so that the parties' reasonable expectations are realized (citation omitted)." See, Snug Harbor Square Venture v Never Home Laundry, Inc., 252 AD2d 520, 521 (2d Dept 1998); see, also, Zodiac Enterprises, Inc. v American Broadcasting Companies, Inc., 81 AD2d 337, 339 (1st Dept 1981), aff'd, 56 NY2d 738 (1982).

Although New York law governs issues of contract interpretation, "under the FAA certain presumptions inform the analysis" including "the federal policy in favor of arbitration

[which] requires that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" Shaw Group, Inc. V. Triplefine Intern'l Corp., 322 F3d 115, 120 (2d Cir 2003), quoting Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 US 1, 24-25 (1983). In addition, "[a]rbitration is especially favored in resolving disputes involving international commerce" Louis Dreyfus Negoce S.A. v Blystad Shipping & Trading, Inc., 252 F3d 218, 223 (2d Cir.), cert denied 534 US 1020(2001)(citation omitted). At the same time, however, despite this federal policy favoring arbitration, the "obligation to arbitrate remains a creature of contract" and thus "'a party cannot be required to submit to arbitration any dispute which [it] has not agreed to submit.'" Id., at 224, quoting, AT & T Technology, Inc. v. Communication Workers of America, 475 US 643, 648 (1986).

At issue here is whether the claims relating to the alleged breach of the Guarantee Agreement fall within the scope of the arbitration clause contained in the SRA. In this case, the arbitration clause is a broad one as it indicates a clear intent by the parties to arbitrate, without any limitation, all issues relating to the SRA, since it provides for arbitration of "[a]ll disputes arising in connection with the [SRA]." See PaineWebber, Inc. v. Bybyk, 81 F3d at 1199; Collins & Aikman Products Co. v. Building Systems, Inc., 58 F3d 16 (2d Cir 1995); Com-Tech

Associates v. Computer Associates, Intern'l, 753 FSupp 1078, 1084 (ED NY 1990), aff'd, 938 F2d 1574 (2d Cir 1991); Avco Co., L.P. v Walton, 3 AD3d 635 (3d Dept), appeal denied, 2 NY3d 786 (2004).

When, as here, the arbitration clause is broad under the FAA, "it is presumptively applicable to disputes involving matters going beyond the 'interpret[ation] or enforce[ment of] particular provisions' of the contract which contains the arbitration clause." JLM Industries, Inc. v Stolt-Nielson, S.A., 387 F3d 163, 172 (2d Cir 2004)(quoting, Oldroyd v. Elmira Savings Bank, 134 F3d 72, 77 (2d Cir 1998)). To determine whether certain claims fall within the scope of the arbitration clause, the focus is on the conduct alleged in the complaint rather the label attached to claims asserted. Id. If the conduct alleged implicates "the parties rights and obligations under [the primary agreement]" containing the arbitration clause (Dreyfus Negoce S.A. v Blystad Shipping and Trading, Inc., 252 F3d at 224), or "touches matters" covered by the primary agreement (JLM Industries, Inc. v Stolt-Nielson, 387 F3d at 172; L&R Exploration Venture v. Grynberg, 22 AD3d 221, 222 (1st Dept), appeal denied, 6 NY3d 749 (2005)), the matter is subject to arbitration.

Furthermore, when as here, there are a series on interrelated agreements between parties and only the primary agreement contains a broad arbitration provision, it has been held that disputes arising out of all of the agreements should be

arbitrated. See Com-Tech Associates v. Computer Associates, Intern'l, 753 FSupp 1078 (dispute arising out of marketing agreement which did not include arbitration clause was subject to arbitration based on arbitration clause in partnership agreement); L&R Exploration Venture v. Grynberg, 22 AD3d 221 (broad arbitration clause in parties' 1960 agreement required parties to arbitrate claims arising out of subsequently executed contracts when such claims implicated the terms and conditions of earlier agreement); Bayly, Martin & Fay v. Glaser, 92 AD2d 850 (1st Dept), aff'd, 60 NY2d 577 (1983)(arbitration provision in employment agreement applies to related stock purchase agreement and guarantee agreement).

Here, the three agreements at issue, which all concern the parties' rights and obligations under the SRA, are sufficiently related such that dispute arising out of the Guarantee Agreement must be arbitrated under the SRA's broad arbitration clause. Moreover, the conduct alleged with respect to the breach of the Guarantee Agreement, which is based on the Companies' purported failure to meet their obligations under the SRA, clearly implicates the terms and conditions of the SRA.

Moreover, while the Guarantee Agreement does not specifically incorporate the SRA's terms and conditions, contrary to the Companies' argument, it unambiguously ratifies the SRA, while providing additional remedies to ISM in the event the

Companies fail to fulfill their obligations under the SRA. See Dreyfus Negoce S.A. v Blystad Shipping and Trading, Inc., 252 F3d at 228 (holding that indemnification claims based on letters of indemnity were subject to arbitration in accordance with broad arbitration clause in charter agreement where letters of indemnity were not intended to supplant charter but merely to provide additional protection).

In sum, as the claims relating to the Guarantee Agreement unambiguously implicate the Companies' obligations under the SRA and thus fall within the scope of the SRA's broad arbitration clause, the petition to stay the arbitration of these claims must be denied.

Conclusion

In view of the above, it is

ORDERED and ADJUDGED that the petition to stay arbitration of the claims alleged the breach of the Guarantee Agreement is denied; and it is further

ORDERED that the parties shall forthwith proceed to arbitration of these claims.

DATED: May 26 ,2006

J.S.C.